## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) CASE NO. 3:11-cv-00073-GCM ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| PMC STRATEGY, LLC, MICHAEL HUDSPETH, and TIMOTHY BAILEY, Defendants. | ) ) ) ) ) ) |

## ORDER OF DEFAULT JUDGMENT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND ANCILLARY EQUITABLE RELIEF AGAINST DEFENDANTS PMC STRATEGY, LLC AND TIMOTHY BAILEY

### I.    INTRODUCTION

On February 9, 2011, the U.S. Commodity Futures Trading Commission ("Commission") filed its Complaint [D.E. 2] in the above-captioned action against PMC Strategy, LLC ("PMC") and Timothy Bailey ("Bailey") (collectively "Defendants")[1] seeking injunctive and other equitable relief for violations of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1 *et seq.* The Complaint alleged that, from June 30, 2008 to at least February 2011, Defendants engaged in a fraudulent scheme whereby they solicited and accepted more than $669,000 from at least 20 members of the general public (collectively the "pool participants") for the purported purpose of pooling the funds to trade off-exchange foreign currency contracts ("forex") on behalf of the pool participants. Specifically, the Complaint alleged violations of Sections 4b(a)(2)(A)-(C) of

---

[1] Defendant Michael Hudspeth ("Hudspeth") is not in default in this action, therefore he is not subject to this Order of Default Judgment, Permanent Injunction, Civil Monetary Penalties, and Ancillary Equitable Relief Against Defendants PMC Strategy, LLC and Timothy Bailey ("Order"). The findings of fact and conclusions of law contained in this Order are not binding on any other party to this action.

1

the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), and sought, *inter alia,* injunctive relief, disgorgement, restitution and civil monetary penalties.

On February 10, 2011, PMC and Bailey were personally served with the Complaint and the Summons that were issued by the Court on February 9, 2011. The Commission filed its Proof of Service for PMC and Bailey on March 8, 2011 [D.E. 14, 15]. Pursuant to Fed. R. Civ. P. 12(a)(1)(A)(i), PMC's and Bailey's Answers were due on or before March 3, 2011. On March 1, 2011, Bailey, who was not represented by counsel at the time, contacted the Commission to request an extension, until March 7, 2011, in which to file his Answer. The Commission agreed not to file a Motion for Clerk's Entry of Default unless Bailey failed to file his Answer by close of business on March 7, 2011.

On March 8, 2011, Bailey filed a "Notice of Conditional Acceptance" with the Court [D.E. 13]. Fed. R. Civ. P. 8(b) provides that, when responding to a pleading, a party must: (A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party. In his "Notice of Conditional Acceptance," Bailey failed to assert any defenses and failed to admit or deny the allegations asserted in the Commission's Complaint as required by the Federal Rules. PMC failed to file any responsive pleading whatsoever. On March 8, 2011, the Commission, pursuant to Fed. R. Civ. P. 55(a), filed its Request for Clerk's Entry of Default against Bailey and PMC [D.E. 16]. The Clerk of the Court entered the defaults against Bailey and PMC on March 10, 2011 [D.E. 17]. In November 2011, counsel for Bailey filed his Notice of Appearance with the Court. [D.E. 30]. To this date, Bailey has failed to move the Court to set aside the Clerk's Entry of Default.

The Commission has now submitted its Motion for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalties, and Ancillary Equitable Relief Against PMC and Bailey ("Motion") pursuant to Fed. R. Civ. P. 55(b)(2). The Court has considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Motion, and being fully advised in the premises, hereby:

**GRANTS** the Commission's Motion and enters the following Findings of Fact and Conclusions of Law finding the Defendants liable as to all violations as alleged in the Complaint. Accordingly, the Court now issues the following Order which determines that the Defendants have violated Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (Supp. III 2009), and imposes on the Defendants a permanent injunction, remedial equitable relief, including an order to pay restitution, and civil monetary penalties.

## II.  FINDINGS OF FACT

### A. Parties

Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§1.1 *et seq.* (2012). The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

Defendant **PMC Strategy, LLC** was incorporated on June 18, 2008 in North Carolina as a member-managed LLC. Its principal place of business is located at 1829 Dickerson Blvd., Suite 114, Monroe, North Carolina, 28110, which, in actuality, is a UPS store. PMC was engaged in the business of soliciting and accepting funds from customers for the purpose of entering into margined or leveraged agreements, contracts or transactions in forex on behalf of

PMC's customers. PMC is not a financial institution, registered broker dealer, insurance company, bank holding company, investment bank holding company, or the associated person of any such entity. PMC has never been registered in any capacity with the Commission.

Defendant **Timothy Bailey** was an incorporator, officer, director and control person of PMC and resides in Monroe, North Carolina. Bailey traded PMC's forex accounts and had control over funds provided by members of the public to PMC for the purpose of trading forex. Bailey has never been registered in any capacity with the Commission.

### B. The Defendants' Fraudulent Conduct

### 1. Defendants Fraudulently Solicited Pool Participants to Trade Forex

At least as early as June 2008, PMC (by and through its agent(s), in the scope of their employment) began soliciting members of the public for the purported purpose of trading forex in a pooled investment vehicle operated and managed by Defendants. PMC approached prospective pool participants through friends and acquaintances in social situations and advised them that Defendants had formed a company that pooled investor money for the purposes of trading in the forex markets. In order to induce prospective pool participants to invest with PMC, PMC claimed that Bailey and another trader employed by PMC, were both experienced forex traders who had generated good returns in PMC's forex trading accounts. For example, PMC provided documents to prospective pool participants that indicated that PMC had earned a profit of $160,000 from January through June 2008 as a result of its forex trading.[2] These representations were false. PMC was not formed until June 18, 2008 and engaged in no forex

---

[2] The purported profit of $160,000 also was not reflective of Bailey's and the other PMC trader's prior performance trading in the forex market because, although they had traded forex in their own accounts from January to June 2008, that trading resulted in overall losses.

4

trading until July 2008. Furthermore, Bailey's own forex trading during this period resulted in net losses.

PMC also advised prospective pool participants that no more than two percent of their funds would be at risk trading in the forex market at any one time and that pool participants and PMC would evenly split the return on investment ("ROI") each month, which Defendants referred to as the "50-50 program." While in operation, however, PMC routinely placed far more than two percent of pool participants' funds at risk in the forex market. Furthermore, as discussed below, purported monthly profit checks that pool participants received from PMC were not calculated using the ROI formula; rather, they constituted false profits that PMC paid to existing pool participants from new customer funds. In fact, some pool participants subsequently invested additional funds based on the sizable purported monthly profit checks they received from PMC.[3]

Prospective pool participants were also told that they would be able to redeem their funds from PMC upon providing 30 days' notice to PMC. Many such redemption requests were never honored by PMC.

### 2. Defendants' Forex Trading Resulted in Net Losses

PMC had three forex trading accounts: two at Forex Capital Markets, LLC ("FXCM"), which PMC opened in July 2008 and March 2009, respectively, and one at MB Trading Futures ("MBT"), which PMC opened in February 2009. Of the $669,033.16 provided by pool participants for trading in forex, PMC deposited only $497,000 of these funds into these forex trading accounts.

---

[3] In January 2009, PMC notified pool participants of a new program it offered that purportedly used a newly-purchased software program to guarantee a five percent per month ROI to pool participants who invested at least $100,000. Based on the purported success of PMC's forex trading under the existing program, some pool participants provided additional funds to PMC for this purported new program.

Between July 2009 and April 2010, PMC sustained cumulative trading losses at FXCM and MBT of $300,148.39. In fact, PMC incurred trading losses in 15 of the 22 months it traded and was overall net negative from October 2008 onward. All of the funds remaining in any of PMC's trading accounts were eventually transferred to PMC's Bank of America ("BOA") account.

### 3. Defendants Misappropriated Pool Participant Funds

Defendants misappropriated pool participant funds in two ways. First, in order to perpetuate the fraud, they paid existing pool participants a total of $239,251.51 in false profits from funds provided by new participants, in the manner of a Ponzi scheme. Second, Defendants paid themselves a total of $127, 588.09 from pool participant funds to which they were not entitled. Because Defendants never generated a profit trading forex, they were not entitled to any of these funds. In sum, of the $669,033.16 provided by pool participants to Defendants, $300,148.39 was lost in trading (including commissions and fees), $239,251.51 was returned to pool participants in the form of false profits, and $127,588.09 was misappropriated directly by Defendants. The remaining $2,045.17 was misappropriated directly by Defendants, or was otherwise unaccounted for.

### 4. Defendants Provided False Account Statements to Pool Participants in the Form of False Profit Checks

PMC did not send regular account statements to pool participants. Instead, from August 2008 to January 2010, PMC sent false monthly profit checks to pool participants and sent at least one pool participant an e-mail representing that PMC's forex trading was profitable when, in fact, it was unprofitable, as described above. For example, three pool participants received $1,000 checks purporting to represent profits earned for the month of October 2008 when in fact Defendants' actual forex trading that month resulted in total net losses of $195,585.98. Pool

participants were not informed of the losses for that month or any other month. As mentioned above, pool participants received false profit payments from PMC totaling $239,251.51 during a period of time when PMC sustained total net trading losses of $300,148.39.

Additionally, Bailey, who traded PMC's FXCM and MBT forex accounts and therefore knew the true value of the accounts, drafted e-mails indicating the percentage of total ROI mid-month profits, when in fact there were no profits, and PMC sent the e-mails to at least one pool participant. Actual trades were not reflected on the e-mails, and the e-mails did not indicate where pool participants' funds were being held or traded.

### 5.  Defendants Refused to Return Pool Participants' Funds

Not long after PMC ceased sending false profit checks to pool participants, some of the pool participants demanded explanations and began to request redemptions of their initial investments. Their efforts were met with delay, excuses and various inconsistent explanations from Defendants. In one instance, in January 2010, two pool participants had a conference call with PMC to demand an explanation for Defendants' failure to return their money. During the conference call, Defendants advised them that the funds were being held in a brokerage account that required a minimum balance of $1 million, and that any return of funds to pool participants would cause every member of PMC to lose his/her money because the balance would fall below the $1 million maintenance level. When these pool participants subsequently asked to review the business records to verify these assertions, Defendants sent an email to them on September 1, 2010 stating that PMC's corporate certified public accountant advised Defendants against sharing company records because PMC was a private company.

## III.    CONCLUSIONS OF LAW

Under Fed. R. Civ. P. 55(a), a default is entered when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . ." Fed. R. Civ. P. 55(a). Entry of default judgment is left to the sound discretion of the trial court. *Duke Energy Carolinas, LLC v. BlackRock Coal, LLC,* No. 3:11-cv-616-RJC-DSC, 2012 WL 1067695 (W.D.N.C. Mar. 29, 2012) (granting default judgment in plaintiff's favor after finding that service of the complaint and summons on defendant was sufficient yet defendant failed to defend); *C.F. Cloninger Trucking II, Inc. v. SourceOne Group, Inc.,* No. 3:08-cv-00320-FDW, 2009 WL 35191 (W.D.N.C. Jan. 5, 2009) (granting default judgment when defendant failed to defend complaint). *Accord SEC v. Lawbaugh,* 359 F. Supp. 2d 418, 421 (D. Md. 2005) (granting default judgment for permanent injunction, disgorgement and a civil monetary penalty where defendant failed to answer complaint alleging securities fraud and misappropriation). "Rule 55 of the Federal Rules of Civil Procedure authorizes the entry of a default judgment when a defendant fails "to plead or otherwise defend" in accordance with the Rules. Although the clear policy of the Rules is to encourage dispositions of claims on their merits, *see Reizakis v. Loy,* 490 F.2d 1132, 1135 (4th Cir. 1974), trial judges are vested with discretion, which must be liberally exercised, in entering [default] judgments and in providing relief therefrom." *U.S. v. Moradi,* 673 F.2d 725, 727 (4th Cir. 1982).

Upon entry of default, the well-pleaded allegations in the complaint are to be taken as true for purposes of establishing liability. Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the damages—is admitted if a responsive pleading is required and the allegation is not denied."). In determining, whether to enter judgment on the default, the court must determine whether the well-pleaded allegations in the complaint support the relief sought. *Ryan*

*v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (defaulting defendant admits plaintiff's well-pled allegations of fact). If the court finds that liability is established, it must then determine damages. *EEOC v. Carter Behavior Health*, 2011 WL 5325485, at *4 (E.D.N.C. Oct. 7, 2011) (citing *Ryan*, 253 F.3d at 780-81). Although, the Court must make an independent determination regarding damages, *Lawbaugh*, 359 F. Supp. 2d at 422, an evidentiary hearing is not required; rather, the Court may rely on affidavits or documentary evidence in the record to determine the appropriate sum. *See EEOC v. CDG Mgmt., LLC*, No. RDB-08-2562, 2010 WL 4904440, at *2 (D. Md. Nov. 24, 2010) (citations omitted); *EEOC v. North Am. Land Corp.*, No. 1:08-cv-501, 2012 WL 2723727, at *2 (W.D.N.C. Jul 8, 2010). *See generally*, *CFTC v. Capitalstreet Financial, LLC*, No. 3:09-cv-387-RJC-DCK, 2012 WL 79758, at *1 (W.D.N.C. Jan 11, 2012) (taking as true the factual allegations of the complaint which were well-pleaded and issuing a final order of permanent injunction that also provided for restitution, a civil monetary penalty and ancillary equitable relief pursuant to Section 6c of the Act).

In this matter, a Clerk's Entry of Default has been entered against both PMC and Bailey pursuant to the Commission's Request [D.E.17]. As such, in accordance with Fed. R. Civ. P. 55(b)(2), the allegations in the Complaint [D.E. 2] will be taken as true and default judgments are hereby entered against the Defendants.

## A. Jurisdiction

The Court has jurisdiction over the conduct and transactions at issue in this case pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act, 7 U.S.C. § 2(c)(2) (Supp. III 2009). Section 6c(a) of the Act authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any

provision of the Act or any rule, regulation, or order thereunder. 7 U.S.C. § 13a-1(a) (2006).

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that the Defendants transacted business in the Western District of North Carolina, and the acts and practices in violation of the Act occurred within this District, among other places.

### B. The Commodity Exchange Act

In analyzing the Commission's Motion for Entry of Default Judgment, the Court is mindful that a crucial purpose of the Act is "protecting the innocent individual investor – who may know little about the intricacies and complexities of the commodities market – from being misled or deceived." *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1329 (11th Cir. 2002). "*[C]aveat emptor* has no place in the realm of federal commodities fraud. Congress, the CFTC, and the Judiciary have determined that customers must be zealously protected from deceptive statements by brokers who deal in these highly complex and inherently risky financial instruments." *Id.* at 1334.

### 1. Violations of Sections 4b(a)(2)(A)-(C) of the Act

Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), make it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, … that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market –(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever…

As set forth above, from at least June 30, 2008 to February 2011, Defendants violated Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), by, among other things: (i) misappropriating pool participants' funds; (ii) making, causing to be made, and distributing reports and statements to pool participants that contained false information, and (iii) fraudulently soliciting pool participants.

### a. Fraud by Misappropriation

Defendants violated Section 4b of the Act by misappropriating pool participant funds by, among other things, paying themselves commissions to which they were not entitled and making payments of false profits to further their scheme. Misappropriation of pool participant funds constitutes "willful and blatant" fraud in violation of Sections 4b(a)(2)(A) and (C) of the Act. *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000) , *aff'd in relevant part sub nom, CFTC v. Baragosh,* 278 F.3d 319 (4th Cir. 2002), *cert denied*, 537 U.S. 950 (2002) (defendants violated Section 4b(a)(2)(i) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting investor funds for operating expenses and personal use); *In re Slusser,* [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701 at 48,315 (CFTC July 19, 1999), *aff'd in relevant part sub nom., Slusser v. CFTC*, 210 F.3d 783 (7th Cir. 2000) [hereinafter Slusser] (respondents violated Section 4b by surreptitiously retaining money in their own bank accounts that should have been traded on behalf of participants); *CFTC v. King,* No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) ("[Defendant's] violation of section 4b(a)(2)(i), (iii) of the CEA is further proven by his admitted misappropriation of customer funds for personal and professional use."); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003) (misappropriating investors' funds violated Section 4b(a)(2)(i) and (iii) of the Act); *CFTC ex rel Kelley v. McLaurin*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,768 at 44,180 (N.D. Ill. 1996) (by depositing customer funds in accounts in which the customers had no

ownership interest and making unauthorized disbursements for his own use, defendant violated Section 4b of the Act); *see also CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (holding that defendant violated Section 4b when she misappropriated pool participant funds by soliciting funds for trading and then trading only a small percentage of those funds, while disbursing the rest of the funds to investors, herself, and her family).

**b.    Fraud by Issuing False Written Statements to Pool Participants**

Defendants violated Section 4b of the Act by creating and providing to pool participants written statements purporting to show profitable forex trading when, in fact, their forex trading resulted in losses. Despite the considerable trading losses incurred by Defendants, they repeatedly sent pool participants emails falsely stating that PMC had earned profits trading forex. In addition, Defendants sent in excess of 100 false monthly profit checks to pool participants in order to maintain their charade of successfully trading forex. Delivering, or causing the delivery of, false account statements to pool participants constitutes a violation of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B) (Supp. III 2009). *Noble Wealth Data Info. Servs., Inc.,* 90 F. Supp. 2d at 685-87 (D. Md. 2000), *aff'd in relevant part sub nom. Baragosh,* 278 F.3d at 319 (4th Cir. 2002) (defendants violated Section 4b(a) of the Act through the delivery of false account statements); *Capitalstreet Financial, LLC,* 2012 WL 79758, at *1 (holding that defendant violated 4b of the Act by using false monthly account statements to conceal losses and instead represent that defendants were making profitable trades). *Accord CFTC v. Smith,* No. 1:10CV00009, 2012 WL 1642200 at *7 (W.D. Va. Apr. 16, 2012) (finding that defendants violated Section 4b by issuing false monthly statements to customers); *Weinberg,* 287 F. Supp. 2d at 1107 (false and misleading statements as to the amount and location of investors' money violated Section 4b(a) of the Act); *Skorupskas,* 605 F. Supp at 932-33 (finding that defendant violated Section 4b(a) by issuing false monthly statements to customers).

### c.    Solicitation Fraud

To establish that Defendants violated Section 4b of the Act, the Commission must prove

that (1) a misrepresentation, misleading statement, or deceptive omission was made; (2) with

scienter; and (3) that the misrepresentation, misleading statement, or deceptive omission was

material. *CFTC v. King*, No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7,

2007) (citing *CFTC v. R.J. Fitzgerald & Co.*, 310 F. 3d 1321, 1328 (11th Cir. 2002)). As shown

below, Defendants – through their misrepresentations and deceptive omissions of material fact –

violated Section 4b of the Act.

### i.    *Defendants Made Misrepresentations and Omissions*

Defendants violated Section 4b of the Act by willfully making numerous oral

misrepresentations to pool participants and by also failing to disclose material information.

Defendants knew that they made misrepresentations to pool participants when they, among other

things: (1) claimed to have made $160,000 in profit from January to June 2008, when in fact,

PMC was not incorporated until June 18, 2008, and the trading effected by Bailey and PMC's

other forex trader for themselves during this period resulted in net losses; (2) assured pool

participants that no more than two percent of their funds would be at risk yet Defendants

consistently used more than two percent of pool participants' funds to trade forex; and (3)

promised that pool participants could redeem their initial investments upon 30 days' notice when

in fact Defendants refused to honor such requests. In addition, Defendants failed to inform pool

participants that PMC was losing money trading forex in an effort to convince pool participants

to maintain their investments or invest additional funds. False statements made to solicit

prospective pool participants constitute a violation of Section 4b. *Capitalstreet Financial, LLC*,

2012 WL 79758 at *7 (quoting *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d. Cir. 1986)

("[M]aterial misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and the type of trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the [Act]."). *Accord Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 103-04 (7th Cir. 1977) (holding that defendants' representation that plaintiff would lose no more than $7,500 and omission of high risk was a violation of Section 4b of the Act).

      ii.    *Defendants Acted With Scienter*

The scienter element is established when an individual's "conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant must have been aware of the risk." *King,* 2007 WL 1321762, at *2 (citing *R.J. Fitzgerald & Co.,* 310 F. 3d at 1328) (internal quotation marks omitted); *Wasnick v. Refco, Inc.,* 911 F.2d 345, 348 (9th Cir. 1990) (holding that scienter is established when an individual's acts are performed "with knowledge of their nature and character") (citation omitted); *Lawrence v. CFTC,* 759 F. 2d 767, 773 (9th Cir. 1985) (providing that Commission must demonstrate only that a defendant's actions were "intentional as opposed to accidental"). "Recklessness is [also] sufficient to satisfy Section 4b's scienter requirement." *Drexel Burnham Lambert, Inc. v. CFTC,* 850 F.2d 742, 748 (D.C. Cir. 1988).

Defendants made misrepresentations and omissions to PMC pool participants with the requisite scienter. When Defendants made oral representations and issued written statements to PMC pool participants regarding forex trading and the purported profitable returns, Defendants clearly knew such representations and statements were false. Defendants knew they were not successfully trading forex and also knew that they were using pool participant funds to pay purported profits and return principal to other pool participants. Accordingly, the Defendants acted with the requisite scienter.

### iii.   *Defendants' Misrepresentations and Omissions Were Material*

A statement is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000); *see R.J. Fitzgerald & Co.*, 310 F.3d at 1328 ("A representation or omission is material if a reasonable investor would consider it important in deciding whether to make an investment") (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) (internal quotation marks omitted)).  Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *In re Commodities Int'l Corp.*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943, 1997 CFTC LEXIS 8, at *25 (CFTC Jan. 14, 1997).

As demonstrated above, Defendants' misrepresentations and omissions are material in that a reasonable pool participant would want to know, among other things, that the Defendants were not experienced traders, that their personal forex trading was unsuccessful, that PMC consistently put more than two percent of pool participant funds at risk, and that any purported profits on investment were being paid using other PMC pool participants' money as part of a Ponzi scheme.

### d.   <u>Liability Under Section 13(b) of the Act</u>

As a controlling person, Bailey is liable for PMC's violations of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).  "A fundamental purpose of section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep.

(CCH) ¶ 26,080 at 41,576 (CFTC May 12, 1994) (finding principals of company liable because they were officers of corporation who were involved in monitoring sales activities), *aff'd sub nom. JCC, Inc. v. CFTC,* 63 F.3d 1557 (11th Cir. 1995).

Pursuant to the Act, a controlling person is defined as "[a]ny person who, directly or indirectly, controls any person who has violated any provision of the Act [if that controlling person] did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006). To establish the "knowing inducement" element of the controlling person violation, the Commission must show that the "controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988).

Bailey exercised general control of PMC because he was PMC's CEO and was responsible for all of the corporation's acts. As CEO, Bailey opened the trading account at FXCM and traded both the FXCM and MBT accounts. He also was a signatory on the BOA account. As CEO, Bailey had to be aware of the 50-50 program and the five percent guarantee program that PMC offered to pool participants. As PMC's trader, he had knowledge of PMC's forex trading losses. Bailey, despite knowing that PMC's trading was not profitable, permitted PMC to issue false profit checks to pool participants and to himself. Bailey, therefore, did not act in good faith and knowingly induced the acts and omissions that constitute violations of the Act, because he engaged in, and had actual knowledge of, the conduct upon which the violations of the Act are based. Because Bailey had the requisite control of PMC and knew of the on-going fraudulent acts and allowed them to continue, he is also liable for PMC's violations of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

**e.**    **PMC is Liable Under Section 2(a)(1)(B) of the Act and Regulation 1.2**

Bailey committed the acts and omissions described herein within the course and scope of

his employment at PMC. Therefore, PMC is liable under Regulation 1.2, 17 C.F.R. § 1.2 (2012)

and Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principal for its agent's

violations of the Act .

**C.**    **There is a Reasonable Likelihood of Continued Misconduct by the Defendants**

In order to obtain permanent injunctive relief in an action under Section 6c of the Act, the

Commission must not only establish that a violation of the Act has occurred, but also that there is

a reasonable likelihood of future violations. *See CFTC v. IBS, Inc.*, 113 F. Supp. 2d 830, 848

(W.D.N.C. 2000) (quoting *CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir. 1979), *cert. denied* 442

U.S. 921 (1979) (finding that "[o]nce a violation is demonstrated, the moving party need show

only that there is some reasonable likelihood of future violations" under Section 6c of the Act).

To be sure, while past misconduct does not require the conclusion that there is a likelihood of

future misconduct, it is "highly suggestive of the likelihood of future violations." *Hunt*, 591

F.2d at 1220; *see also CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 191 (D.N.J. 1988)

("The likelihood of future violations may be inferred from past infractions based upon

consideration of the totality of the circumstances to determine if the past infraction was an

isolated occurrence as opposed to an indication of a systematic and continuous pattern of

wrongdoing.") (Citation omitted); *Cf. SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) ("the

[Securities and Exchange] Commission is entitled to prevail when the inferences flowing from

the defendant's prior illegal conduct, viewed in light of the present circumstances, betoken a

'reasonable likelihood' of future transgressions"), *cert. denied sub nom.,* 454 U.S. 1124 (1981)

(citations omitted); *Hunt*, 591 F.2d, at 1219-20 (reversing the district court's denial of injunctive

relief, and stating that a court of appeals should not hesitate "to reverse an order denying

[injunctive] relief when it is evident that the trial court's discretion has not been exercised to

effectuate the manifest objectives of the specific legislation involved") (internal quotation marks

and citation omitted).

Here, the Commission has made a showing that Defendants engaged in acts and practices

that violated Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009).

Based on the egregiousness and repetitive nature of the conduct in this matter, it is clear that,

unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendants

will continue to engage in the acts and practices alleged in the Complaint and in similar acts and

practices in violation of the Act.

## IV.      REMEDIES

### A. Permanent Injunction

Based on the conduct described above, the Court enters an injunction against the

Defendants permanently restraining, enjoining, and prohibiting them from directly or indirectly:

1. Engaging in conduct that violates Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§
   6b(a)(2)(A)-(C) (Supp. III 2009);

2. Engaging in any activity involving:

   a.    trading on or subject to the rules of any registered entity (as that term is defined in
         Section 1a of the Act, as amended, 7 U.S.C. § 1a);

   b.    entering into any transactions involving commodity futures, options on commodity
         futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R.
         § 1.3(hh) (2012)) ("commodity options"), security futures products, and/or foreign
         currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as
         amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own
         personal account or for any account in which they have a direct or indirect interest;

   c.    having any commodity futures, options on commodity futures, commodity
         options, security futures products, and/or forex contracts traded on their behalf;

d.       controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

e.       soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

f.       applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and/or

g.       Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012).

## B. Restitution

### 1. The Court Has Authority to Order Restitution

In a civil enforcement action brought pursuant to Section 6c, the district court may also order ancillary equitable relief that it deems appropriate, including restitution and disgorgement. *CFTC v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 193 (4th Cir. 2002) ("[i]t is well settled that equitable remedies such as disgorgement are available to remedy violations of the [Act]"); *United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760-61 (6th Cir. 1999) ("[r]estitution and disgorgement are part of the court's traditional equitable authority").

This authority is founded on the well-established legal principle articulated by the Supreme Court in *Porter v. Warner Holding Co.*:

> Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader power and more flexible character

> than when a private controversy is at stake. Power is thereby resident in the District Court, in exercising this jurisdiction, "to do equity and to mould each decree to the necessities of the particular case."

*Porter*, 328 U.S. 395, 398 (1946) (citations omitted).

### 2. Restitution Will be Measured in Amount of Participants' Losses

The object of restitution is to restore the status quo and return the parties to the positions they occupied before the transactions at issue occurred. *Porter*, 328 U.S. at 402 (equitable restitution consists of "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant"); *United States v. Long*, 537 F.2d 1151, 1153 (4th Cir. 1975) (restitution consists of restoring the injured party "to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money") (quoting Restatement of Restitution, § 1, cmt. a (1937)); *see also SEC v. AMX Int'l, Inc.*, 7 F.3d 71, 74–75 (5th Cir.1993) ( "[r]estitution . . . has the goal of making the aggrieved party whole"); *First Penn Corp. v. FDIC*, 793 F.2d 270, 272 (10th Cir.1986) ("[t]he object of restitution is to return the parties to the position that existed before the transaction occurred").

"Restitution is measured by the amount invested by customers less any refunds made by the [D]efendants." *Noble Wealth Data Systems, Inc.*, 90 F. Supp. 2d at 693; *see also CFTC v. Marquis Fin. Mgmt. Systems, Inc.*, 2005 WL 3752232, at *6 (E.D. Mich. 2005) (ordering restitution in the amount of net customer deposits); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 455 (D. N.J. 2000) (ordering restitution in amount of customer deposits).

Here, during the time period from June 2008 through February 2011, Defendants fraudulently solicited $669,033.16 from pool participants, and pool participants redeemed $239,251.51. Accordingly, the Court orders PMC and Bailey, jointly and severally, to pay restitution in the amount of $429,781.65, the total amount of losses incurred by pool participants.

### 3. Payment of Restitution

The Court orders Defendants to immediately pay restitution in the amount of

$429,781.65, jointly and severally, plus post-judgment interest, (the "Restitution Obligation").

Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry

of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of

entry of this Order pursuant to 28 U.S.C. § 1961.

To effect payment of the Restitution Obligation and the distribution of any restitution

payments to Defendants' pool participants, the Court appoints the National Futures Association

("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from

Defendants and make distributions as set forth below. Because the Monitor is acting as an

officer of this Court in performing these services, the NFA shall not be liable for any action or

inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

Defendants shall make Restitution Obligation payments under this Order to the Monitor

in the name "PMC Strategy, LLC/Bailey Restitution Fund" and shall send such Restitution

Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check,

bank cashier's, or bank money order, to the Office of Administration, National Futures

Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under a cover letter

that identifies the Defendant and the name and docket number of this proceeding. Defendants

shall simultaneously transmit copies of the cover letter and the form of payment to the Chief

Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st

Street, NW, Washington, D.C. 20581.

The Monitor shall oversee the Restitution Obligation and shall have the discretion to

determine the manner of distribution of such funds in an equitable fashion to Defendants' pool

participants identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part C below.

Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' pool participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' pool participants during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The amounts payable to each pool participant shall not limit the ability of any pool participant from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.

Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each pool participant of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

## C. Civil Monetary Penalty

### 1. Calculation of Penalty

The Court has jurisdiction to impose a Civil Monetary Penalty ("CMP") of "*the greater of* [$130,000 for each violation occurring prior to October 23, 2008 and $140,000 for each violation occurring on or after October 23, 2008],[4] or triple the monetary gain to the [Defendant] for each violation." 7 U.S.C. §13a-1 (2006) (emphasis added). The Commission may, as it did here, allege multiple violations in a single count. *CFTC v. Levy*, 541 F.3d 1102, 1110-11 (11th Cir. 2008). Thus, the Court must first determine the number of violations in order to calculate the maximum civil monetary penalty that may be imposed.

The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent. *Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999). "In determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations." *Capitalstreet Financial, LLC*, 2012 WL at *15 (quoting *Noble Wealth*, 90 F. Supp. 2d at 694). Conduct that violates the core

---

[4] *See* Regulation 143.8(a)(1)(iii)-(iv), 17 C.F.R. § 143.8(a)(1)(iii)-(iv) (2012).

provisions of the Act, such as customer fraud, should be considered extremely serious. *JCC, Inc.*
*v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995). In *JCC, Inc.*, the U.S. Court of Appeals for the
Eleventh Circuit upheld the district court order imposing a civil monetary penalty, finding that
"[c]onduct that violates the core provisions of the Act's regulatory system – such as
manipulating prices or defrauding customers *should be considered very serious* even if there are
mitigating facts and circumstances." *Id.* at 1571 (internal quotation marks and citation omitted)
(emphasis added). In the case at hand, there are no mitigating facts or circumstances. Instead,
Defendants were blatant and malicious in their fraudulent conduct.

The Commission has requested that the Court impose a significant sanction and order
Bailey to pay a CMP of $420,000. The Court agrees that a significant sanction should be
imposed and the Court will order Bailey to pay a penalty of $420,000 ("Bailey's CMP
Obligation"). The Commission, based on the totality of the circumstances and violations of the
Act, has also requested that the Court order PMC to pay a CMP of $560,000. The Court agrees
and will order PMC to pay a penalty of $560,000 ("PMC's CMP Obligation").

**Payment of Penalty**

The Defendants shall pay their CMP Obligations immediately and post-judgment interest
shall accrue on the CMP Obligations beginning on the date of entry of this Order and shall be
determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28
U.S.C. § 1961 (2006).

Defendants shall pay their CMP Obligations by electronic funds transfer, or by U.S.
Postal money order, certified check, bank cashier's check, or bank money order. If payment is to
be made other than by electronic funds transfer, the payment shall be made payable to the
Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
ATTN: Accounts Receivables – AMZ 340
E-mail Box: 9-AMC-AMZ-AR-CFTC
DOT/FAA/MMAC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Defendants shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the penalty with a cover letter that identifies the Defendant and the name and docket number of the proceedings. The Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, and the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

**D. Miscellaneous Provisions**

**Equitable Relief:** The injunctive and equitable relief provisions of this Order shall be binding upon the Defendants and upon any persons who are acting in the capacity of agent, officer, employee, servant, attorney, successor and/or assignee of the Defendants, and upon any person acting in active concert or participation with the Defendants who receives actual notice of this Order by personal service or otherwise.

**Notices:** All notices required to be given to the Commission by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Director of Enforcement
Commodity Futures Trading Commission
Division of Enforcement
Three Lafayette Centre

1155 21st Street, NW
Washington, DC 20581

**Continuing Jurisdiction of this Court:**  This Court shall retain jurisdiction of this case to assure compliance with this Order and for all other purposes related to this action.

**SO ORDERED**, this _____18th_____ day of _____October_____, 2012, at Charlotte, North Carolina.

GRAHAM C. MULLEN
UNITED STATES DISTRICT JUDGE