IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:11CV73

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| PMC STRATEGY, LLC, MICHAEL HUDSPETH, and TIMOTHY BAILEY, | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court upon Plaintiff U.S. Commodity Futures Trading

Commission's ("CFTC") Motion for Summary Judgment against Defendant Michael Hudspeth

("Hudspeth") (D.E.#55). The CFTC seeks summary judgment as to liability, entry of an order of

permanent injunction, restitution, and civil monetary penalties. Hudspeth, who is appearing *pro

se*, responded to Plaintiff's motion by filing a Motion to Vacate Summary Judgment for Lack of

Subject Matter Jurisdiction[1], which the Court will treat as his response in opposition.  Plaintiff

filed a Reply and this motion is now ripe for disposition.

Plaintiff CFTC filed this action on February 9, 2011 against Defendant Hudspeth,

Timothy Bailey, and PMC Strategy, LLC ("PMC").  The Complaint alleges that Defendants

violated the anti-fraud provisions of the Commodity Exchange Act (the "Act") by engaging in a

business that operated as a fraud upon prospective and actual participants in a commodity pool

created for the purpose of trading off-exchange foreign currency contracts ("forex").

---

[1] The Court has previously ruled that Defendant's challenges to subject matter jurisdiction are without merit. (D.E. #s 42 and 48).

1

Specifically, the CFTC claims that Defendants violated Sections 4(b)(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6(b)(a)(2)(A)-(C), by fraudulently soliciting pool participants and prospective pool participants, misappropriating pool participant funds, providing false statements to pool participants, and offering guaranteed profits. Default judgment was entered against PMC and Timothy Bailey on October 18, 2012. Hudspeth is the sole remaining Defendant.

In support of its Motion for Summary Judgment, the CFTC has submitted declarations, documentary evidence, sworn testimony of pool participants, and Hudspeth's own admissions. This evidence establishes the undisputed facts set forth below.

## I.     UNDISPUTED FACTS

PMC was incorporated on June 18, 2008 in North Carolina as a member-managed LLC. PMC engaged in the business of operating an investment pool for the purpose of soliciting and accepting funds from pool participants for entering into margined or leveraged agreements, contracts, or transactions in forex on behalf of PMC's pool participants. Defendant Hudspeth was President and an incorporator, principal and controlling person of PMC and held himself out to the public as a managing partner of PMC. Moreover, Hudspeth maintained PMC's records.

Hudspeth solicited prospective pool participants to invest with PMC. As part of his solicitation, Hudspeth told prospective pool participants that, under the terms of agreement with PMC, each pool participant would receive a monthly payout of 50 percent of the monthly gross profits (i.e., return on investment ("ROI")) earned by PMC from trading forex with the pool participants' funds based on the amount of each participant's principal investment. PMC would retain the remaining 50 percent of the profits. This term was also reflected in a document entitled "PMC Strategy, LLC payout procedures/guidelines" distributed by Hudspeth to prospective pool participants. Hudspeth believed he was entitled to one-third of any funds earned by PMC.

2

Hudspeth also told prospective pool participants that they could withdraw their principal investments from PMC upon 30 days written notice or "at the end of any consecutive monthly trading cycle." This term was also reflected in the "PMC Strategy, LLC payout procedures/guidelines" distributed by Hudspeth to prospective pool participants.

As part of his solicitation, Hudspeth also told prospective pool participants that only a small percentage of their funds (2 or 10 percent) would be at risk trading forex with PMC. This claim of limited risk was also reflected in the "Private Money Club" promotional document sent by Hudspeth to prospective pool participants which stated in part:

> We have developed a Medium Term System and a Short Term System that minimizes our risk to about 2% and our account draw down to around 10% on any given trade (this means we never trade with more than 10% of the client's principal amount daily).

Hudspeth also represented to prospective pool participants in June 2008 that PMC's traders, Timothy Bailey ("Bailey") and Sam Watkins ("Watkins"), had earned substantial profits from trading forex over the past several months. For example, on June 18, 2008, Hudspeth emailed one prospective pool participant and told him that PMC had traded a

> $100K principal deposit … from January 2008 thru May 2008 (five months only) for a total NET profit of $169,438!!!! We are still trading this same account presently. This shows you proof of what we have accomplished with this account in just 5 months, 34% per month or 170% R.O.I. in just 5 months!!

These purported trading results of PMC from January to May 2008 were also reflected in a promotional document titled "Private Money Club" sent by Hudspeth to prospective pool participants which claimed "[w]e have the graphs and data to show proof—this is not a hypothetical scenario, it is working with clients [sic] direct funds."

On June 21, 2008, Hudspeth sent an email to a prospective pool participant stating

3

that the balance in PMC's forex trading account at FXDD (a forex broker), in which pool participant funds were purportedly traded, had increased from $1 million on May 30, 2008 to more than $1.3 million by June 20, 2008. On June 23, 2008, Hudspeth sent another email to prospective pool participants stating that PMC's balance in its FXDD trading account was now more than $1.4 million and had earned a 40 percent profit thus far in the month of June. Later that same day, Hudspeth sent another email to prospective pool participants stating that PMC's trading account balance had increased by another $22,400 since the morning, raising the month-to-date profit to 42.4 percent. In reality, however, these purported profits reported to prospective pool participants were hypothetical results achieved in a demo account at FXDD, not profits earned from actual forex trading of participant funds. Hudspeth knew that PMC did not trade forex prior to July 2008 and that one of PMC's traders was "experimenting with [a hypothetical scenario] before PMC was set up." PMC was not formed until June 18, 2008, and while PMC's traders, Bailey and Watkins, did trade forex for themselves from January through June 2008, which Hudspeth promoted to prospective pool participants, their trading resulted in consistent net losses. While Hudspeth promoted hypothetical results in the FXDD demo account as described above, some of the pool participant funds were actually traded in four different forex trading accounts opened by Hudspeth and Bailey in PMC's name at forex brokers Forex Capital Markets LLC ("FXCM"), Forex Capital Markets Ltd. ("FXCM Ltd."), and MB Trading Futures, Inc. ("MBT"). The first of these accounts was not opened until July 2008.

Hudspeth created a user name and password in order to access PMC's account at MBT, and therefore Hudspeth had access to account statements, trading results, and other information regarding PMC's trading performance in the MBT account. PMC maintained a single bank account at Bank of America ("BOA"). Hudspeth was a signatory on the BOA account,

maintained the check register, wrote checks from that account to pay PMC's expenses, and at all material times had knowledge of PMC's financial status. Hudspeth instructed pool participants to wire their funds to PMC's BOA bank account in order to invest in the pool. Hudspeth tracked and had control over funds deposited by pool participants with PMC.

Between June 2008 and September 2009, pool participants provided PMC a total of $669,033.16 for the purpose of trading forex, which was deposited into PMC's BOA bank account. Between July 2008 and August 2009, PMC deposited a total of approximately $498,000, almost 75 percent of the total funds provided by pool participants, into the trading accounts at FXCM, FXCM Ltd., and MBT. In the 27 months of trading between July 2008 and September 2010, PMC traded forex with these funds and incurred cumulative net losses of $300,478.18. During this period, 17 of the 27 months of trading ended in a net monthly loss. In October 2008 alone, PMC incurred losses of more than $195,000 and earned a profit in only seven of the subsequent 23 months, the highest of which was $4,565.89. Despite having incurred the $195,000-plus loss in October 2008 followed by losses of approximately $23,000 and $27,000 in November and December, in January 2009, Hudspeth sent an email to pool participants regarding a new investment program claiming that, based on recently acquired computer software, "PMC will GUARANTEE (yes, that is right, and no, I have not been drinking) a MINIMUM NET ROI of 5% MONTHLY PAYOUT" starting in February 2009. According to Hudspeth, the start of the new "program" was contingent on raising at least an additional $1 million from pool participants who must agree to maintain their accounts for at least 12 months. Hudspeth reiterated the guaranteed returns in another email to a pool participant on March 11, 2009 stating that "the new [five percent] program IS a 'guarantee'" and that "[t]he new 5% software is working very well, indeed."

Between August 2008 and June 2010, PMC returned a total of $239,251.51 to pool participants. A substantial portion of these funds were returned to pool participants in the form of monthly checks signed by Hudspeth from August 2008 through January 2010 representing profits purportedly earned from PMC's forex trading in accordance with the "PMC Strategy, LLC payout procedures/guidelines" and as determined each month by Hudspeth, Bailey and Watkins. During that same period, PMC's actual trading resulted in cumulative net losses of more than $299,000, including losses in 11 out of 18 months. In addition to the monthly profit checks, from at least August 2008 through November 2009 Hudspeth sent weekly and/or monthly email updates to pool participants describing consistent profits purportedly earned by PMC trading forex. During that same period, PMC's actual forex trading resulted in cumulative net losses of almost $298,000, including losses in 9 out of 16 months. In addition to the profit checks and the weekly and monthly email updates, PMC sent IRS 1099 forms to pool participants showing annual profits purportedly earned by the pool participants as a result of PMC's forex trading. Some pool participants elected to maintain and/or increase their principal investments with PMC based on receiving the regular profit checks and weekly and monthly updates regarding the profits PMC was purportedly earning trading forex for the pool participants.

Between August 2008 and January 2010, $127,588.09 was withdrawn from PMC's BOA bank account by Hudspeth and the other principals and traders of PMC; $1,715.38 of pool participant funds is unaccounted for. PMC was entitled to retain a portion of the pool participants' funds only if PMC earned profits from its forex trading.

Despite repeated requests from multiple pool participants for the return of their

principal investments, PMC failed to return all of their funds. Hudspeth told some pool participants that PMC would be able to refund their principal if and when a new investor provided funds to PMC. Despite his knowledge of PMC's prior trading losses, Hudspeth continued to solicit prospective pool participants as late as January 2011 claiming that PMC had earned a 537% profit in 2010.

## II.   DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when the moving party submits evidence showing "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, summary judgment must be entered "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . .." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). Once the moving party establishes that there are no genuine issues of material fact, the burden shifts to the non-moving party who "must do more than simply show that there is some metaphysical doubt as to material facts." *Id*. at 586. Under Fed. R. Civ. P. 56(c)(1), the nonmoving party may not rely merely upon allegations or denials in its own pleadings but must set forth specific facts showing that there is a genuine issue for trial. To create a genuine issue of material fact, the non-moving party must cite competent, admissible evidence, and there must be sufficient evidence for the jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. If the non-moving party fails to produce the required evidence, the moving party must prevail on its Motion for Summary Judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Even where intent and

7

motive are crucial to determining the outcome of the cause of action, unsubstantiated speculation and bald assertions will not withstand summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). Summary judgment is appropriate and trial is unnecessary if either "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

### B. Fraud in Violation of Section 4(b)

Sections 4b(a)(2)(A)-(C) of the Act provide, in relevant part, that it is unlawful for any person, in connection with the making of a forex contract for, on behalf of, or with any other person, (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in connection with such contract.

To establish that Hudspeth violated Section 4b of the Act through fraudulent sales solicitations, the Plaintiff must prove that: (1) a misrepresentation, misleading statement, or deceptive omission was made; (2) with scienter; and (3) that the misrepresentation, misleading statement, or deceptive omission was material. *See, e.g., CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 446-47 (D.N.J. 2000). Scienter requires proof that a defendant committed the alleged wrongful acts intentionally or with reckless disregard for his duties under the Act. *Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988); *see also First Commodity Corp. of Boston v. CFTC*, 676 F.2d 1, 7 (1st Cir. 1982) ("A 'reckless' misrepresentation is one that departs so far from the standards of ordinary care that it is very difficult to believe the speaker was not aware of what he was doing."). A statement is material if it is substantially likely that "a reasonable

8

investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328-29 (internal quotation omitted); *see also CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000), *aff'd in relevant part, rev'd in part sub nom.*, *CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) (representations about profit potential and risk "go to the heart of a customer's investment decision and are therefore material as a matter of law"). Moreover, a material misrepresentation or omission is a violation whether or not it induces investor action or inaction; rather, it is sufficient that a material misrepresentation or omission is made to "attempt to cheat or defraud" or willfully to "attempt to deceive" a person. *See CFTC v. Int'l Fin. Servs.*, Inc., 323 F. Supp. 2d 482, 502 (S.D.N.Y. 2004) (investor reliance need not be proven in an enforcement action alleging fraud) (citing *Slusser v. CFTC*, 210 F.3d 783, 785-86 (7th Cir. 2000)). Federal courts and the CFTC itself have long held that guarantees of profitability are both material and inherently fraudulent. *Anderson v. Beach, et al.*, [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,951 at 62,372 (CFTC Nov. 25, 2008) (citing *CFTC v. Carnegie Trading Group, Ltd.*, 450 F.Supp. 2d 788, 799 (N.D. Ohio 2006) and *Munnell v. Paine Webber Jackson & Curtis*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,313 at 32,863 (CFTC Oct. 8, 1986)).

Delivering, or causing the delivery of, false statements or reports to pool participants concerning profitability of trading constitutes a violation of Section 4b of the Act. *See, e.g., CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1107 (C.D. Cal. 2003) (finding that false and misleading statements as to amount and location of investor money violated Section 4b of the Act); *CFTC v. Sorkin*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,855 at 27,585 (S.D.N.Y. Aug. 25, 1983) (determining that distribution of false account statements falsely reporting trading activity or equity violates Section 4b of the Act). Misappropriation of

9

investor funds is a "willful and blatant" fraud that violates Section 4b of the Act. *Noble Wealth Data*, 90 F. Supp. 2d at 687 (D. Md. 2000); *see also, e.g., Weinberg*, 287 F. Supp. 2d at 1107 (defendant violated Section 4b by using investor funds for his personal use and benefit).

As described above, during the course of his solicitations, Hudspeth, individually and on behalf of PMC, lied to existing and prospective pool participants about the profitability of PMC's forex trading and falsely led pool participants to believe that they would make large profits by allowing PMC to trade forex with their funds. Hudspeth went so far as to guarantee such profits. As a principal of PMC and signatory on PMC's bank and trading accounts and at all times possessing knowledge of PMC's financial status, Hudspeth knowingly or with reckless disregard of the truth made these misrepresentations and omissions in order to induce prospective pool participants to invest with PMC. These misrepresentations and omissions are material in that a reasonable pool participant would want to know, among other things, (i) that the profits purportedly earned by PMC's traders trading forex between January and June 2008 were only hypothetical based on trading conducted in a demo trading account without real money and that the actual trading conducted by PMC's traders during that period resulted in net losses, and (ii) that contrary to Hudspeth's representations that no more than 10 percent of the pool participants' funds would ever be at risk, PMC consistently traded far more than 10 percent of these funds and ultimately lost approximately $300,000 of the $669,000 provided by pool participants. Accordingly, each of the elements of solicitation fraud under Section 4b(a)(2) of the Act is met in this case with respect to Hudspeth.

Similarly, by sending weekly and monthly updates to pool participants that misrepresented the performance of PMC's forex trading and, hence, the value of the pool participants' investment as well as issuing false profit checks and IRS 1099 forms to pool

participants, Hudspeth violated Section 4b(a)(2) of the Act. Finally, Hudspeth's and PMC's

withdrawal of more than $125,000 of the pool participants' funds and their failure to return these

funds to the pool participants constitutes misappropriation in violation of Section 4b(a)(2) of the

Act. In fact, Hudspeth's statements to pool participants that PMC could refund their

investments only upon PMC's receipt of new investor funds is highly suggestive that PMC was

operating as a Ponzi scheme.

### C. Section 13(b) Liability

Section 13(b) of the Act provides, "[a]ny person who, directly or indirectly, controls any

person who has violated any provision of the Act . . . may be held liable . . . [if that controlling

person] did not act in good faith or knowingly induced, directly or indirectly, the act or acts

constituting the violation." 7 U.S.C. § 13c(b) (2006). "A fundamental purpose of section 13(b) is

to allow the Commission to reach behind the corporate entity to the controlling individuals of the

corporation and to impose liability for violations of the Act directly on such individuals as well

as on the corporation itself." *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep.

(CCH) ¶ 26,080 at 41,576 (CFTC May 12, 1994) (finding principals of company liable because

they were officers of corporation who were involved in monitoring sales activities), *aff'd*, 63

F.3d 1557 (11th Cir. 1995). Control person liability attaches where such a person "possessed the

power or ability to control the specific transaction or activity upon which the primary violation

was predicated, even if such power was not exercised." *Monieson v. CFTC*, 996 F.2d 852, 859

(7th Cir. 1993) (quoting *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138 (7th

Cir. 1992)). "A controlling person is said to fail to act in good faith if he 'did not maintain a

reasonably adequate system of internal supervision and control over the [employee] or did not

enforce with any reasonable diligence such system.'" *CFTC v. Johnson*, 408 F. Supp. 2d 259,

11

269 (S.D. Tex. 2005) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). Furthermore, recklessness is sufficient to establish control person liability. *See G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 959 (5th Cir. 1981) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 n.28 (1976)). "If the rule were otherwise, corporate officers and directors could escape control liability by remaining as ignorant as possible – surely not the result Congress intended." *Donohoe*, 982 F.2d at 1138.

To establish the "knowing inducement" element of the controlling person violation, the CFTC must show that the "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *Johnson*, 408 F. Supp. 2d at 269 (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1568 (11th Cir. 1995)). Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *Monieson*, 996 F.2d at 861. To support a finding of constructive knowledge, the CFTC must show that a defendant "lack[ed] actual knowledge only because [he] consciously avoided it." *JCC, Inc.*, 63 F.3d at 1569 (citations omitted).

Here, the record clearly shows that Hudspeth shared control over the operations of PMC and that he had the ability to control the specific activities upon which the violations are based. As noted above, Hudspeth was President and an incorporator, principal, and managing partner of PMC. Hudspeth admits that he was "responsible for [PMC's] acts," maintained PMC's records, "had control over the funds deposited with PMC" by pool participants, and otherwise "had knowledge of PMC's financial issues" at all material times. Hudspeth, in fact, admits he was a controlling person. Under these circumstances, it is clear that Hudspeth had "the power or ability to control" PMC's activities." *See Monieson*, 996 F.2d at 859 (statutes such as Section 13(b) are "remedial, to be construed liberally, and requir[e] only some indirect means of

discipline or influence short of actual direction to hold a control person liable.") (internal quotes and citation omitted). Hudspeth solicited and issued regular performance updates to pool participants, signed the monthly "profit" checks sent to pool participants, and had the authority and ability to examine the trading account records to determine if PMC's trading was in fact profitable. The record evidence firmly establishes that Hudspeth failed to act in good faith and had actual knowledge of the core activities that constitute the violations at issue and allowed them to continue. Therefore, Hudspeth is liable as a controlling person of PMC for its violations of the Act.

Based upon the foregoing, the Court finds that there is no genuine issue of material fact as to liability. Hudspeth has failed to carry his burden to cite any competent, admissible evidence sufficient for a fact-finder to return a verdict in his favor. *See Anderson*, 477 U.S. at 252.

### D. Injunction

The CFTC seeks relief in the form of an entry of permanent injunction to prevent Hudspeth from further violations of the Act, restitution, and civil monetary penalties. Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), authorizes and directs the CFTC to enforce the Act and allows a district court, upon proper showing, to grant a permanent injunction. *CFTC. v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008). In an action for permanent injunctive relief, the CFTC is not required to make a specific showing of irreparable injury or inadequacy of other remedies, which private litigants must make. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141-42 (2d Cir. 1977). Rather, the CFTC makes the requisite showing for issuance of injunctive relief when it presents a *prima facie* case that the defendant has engaged, or is engaging, in illegal conduct, and

13

that there is a likelihood of future violations. *CFTC. v. Hunt,* 591 F.2d 1211, 1220 (7th Cir. 1979), *cert. denied*, 442 U.S. 921 (1979); *CFTC v. Am. Bd. of Trade*, *Inc*., 803 F.2d 1242, 1250-51 (2d Cir. 1986).

Whether such a likelihood of future violations exists depends on the "totality of the circumstances." *SEC v. Management Dynamics, Inc*., 515 F.2d 801, 807 (2d Cir. 1975); *CFTC v. Morgan, Harris & Scott, Ltd*., 484 F. Supp. 669, 676-77 (S.D.N.Y. 1979). Foremost among these circumstances is the past illegal conduct of the defendant, from which courts may infer a likelihood of future violations. *British Am. Commodity Options Corp.*, 560 F.2d at 142; *Management Dynamics, Ltd*., 515 F.2d at 807; *SEC v*. *Carriba Air, Inc.,* 681 F.2d 1318, 1322 (11th Cir. 1982).

The Court finds that based upon the CFTC's showing of a violation and likelihood of future violations, permanent injunctive relief is necessary and warranted against Hudspeth. Accordingly, the Court will enter a permanent injunction restraining, enjoining, and prohibiting Hudspeth and any of his agents, servants, employees, assigns, attorneys, and persons in active concert or participation with him from, directly or indirectly, violating Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C.§§ 6b(a)(2)(A)-(C).

**E.  Restitution**

The unqualified grant of statutory authority to issue an injunction under the Act carries with it the full range of equitable remedies, among which is the power to grant restitution and disgorgement. *CFTC v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 193 (4th Cir. 2002) ("[I]t is well settled that equitable remedies such as disgorgement are available to remedy violations of the [Act]."); *United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760 (6th Cir. 1999)

14

("Restitution and disgorgement are part of courts' traditional equitable authority."). In addition to a permanent injunction, the CFTC has requested an award of restitution to pool participants.

"Restitution is measured by the amount invested by customers less any refunds made by the [D]efendants." *Noble Wealth Data,,* 90 F. Supp. 2d at 693; *see also CFTC v. Marquis Fin. Mgmt. Systems, Inc*., 2005 WL 3752232, at *6 (E.D. Mich. 2005) (calculating restitution in the amount of net customer deposits); *Rosenberg,* 85 F. Supp. 2d at 455 (ordering restitution in amount of customer deposits). Here, during the time period from June 2008 through February 2011, Hudspeth, individually and as a controlling person of PMC, fraudulently obtained $669,033.16 from pool participants, and pool participants redeemed $239,251.51. Accordingly, the CFTC has requested that the Court order Hudspeth to pay restitution in the amount of $429,781.65, which is the amount of total pool participant losses, and to pay this amount jointly and severally and consistent with the terms of the order of restitution awarded against PMC and Bailey in the Order of Default Judgment entered on October 18, 2012 [D.E. 41]. The CFTC has also requested postjudgment interest on this amount. The Court finds the requested restitution to be appropriate in this case.

### F. Civil Monetary Penalty

Under Section 6c(d)(1)(A) of the Act, 7 U.S.C. § 13a-1(d)(1)(A) (2006), the CFTC may seek and the Court shall have jurisdiction to impose, on any person found in the action to have committed any violation, a civil penalty in the amount of (1) triple the monetary gain to defendant for each violation of the Act, or (2) $130,000 for each violation of the Act from October 23, 2004 through October 22, 2008, and $140,000 for each violation of the Act on or after October 23, 2008. 7 U.S.C. § 13a-1(d)(1)(A) (2006) and 17 C.F.R. § 143.8 (2012). The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and

15

sufficient to act as a deterrent. *See Miller v. CFTC,* 197 F.3d 1227, 1236 (9th Cir. 1999). "In determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations." *Noble Wealth Data*, 90 F. Supp. 2d at 694. Conduct that violates the core provisions of the Act, such as investor fraud, should be considered extremely serious, regardless of whether mitigating circumstances exist. *JCC, Inc.*, 63 F.3d at 1571. In the case at hand, there are no mitigating facts or circumstances. Instead, Hudspeth was blatant in his fraudulent conduct, or at least, extremely reckless in his behavior. The CFTC has set forth several factors to consider in assessing a civil monetary penalty, including: the relationship of the violation at issue to the regulatory purposes of the Act and whether or not the violations involved core provisions of the Act; whether or not scienter was involved; the consequences flowing from the violative conduct; financial benefits to a defendant; and harm to customers or the market. *In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), *aff'd*, 137 F.3d 1300 (11th Cir. 1998). Civil monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations," which means that civil monetary penalties should make it financially detrimental to a defendant to fail to comply with the Act so that the defendant would rather comply than risk violations. *Id; see also Reddy v. CFTC*, 191 F.3d 109, 123 (2d Cir. 1999) (civil monetary penalties serve to further the Act's remedial policies and to deter others from committing similar violations). Here, Hudspeth, individually and as a controlling person of PMC, knowingly engaged in fraud, which is a core violation of the Act. *Grossfeld*, ¶ 26,921 at 44,467 and n. 28 (citation omitted). Accordingly, the Court will impose a serious and significant sanction and order Hudspeth to pay a civil monetary

penalty of $420,000 and to pay this amount consistent with the terms of Section IV.C of the Order of Default Judgment entered against PMC and Bailey on October 18, 2012.

### G. Defendant's Motions

Defendant Hudspeth has filed several *pro se* motions including a Motion for Release of Funds (D.E. #52), a Motion to Enforce Discovery (D.E. #53) and a Motion to Compel (D.E. # 61). All of these motions are without merit and are denied.

### H. Order

**IT IS THEREFORE ORDERED** that Defendant Hudspeth's Motion for Release of Funds (D.E. #52), Motion to Enforce Discovery (D.E. #53) and Motion to Compel (D.E. # 61) are hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment is hereby **GRANTED,** and Defendant Hudspeth and his agents, servants, employees, assigns, attorneys, and persons in active concert or participation with him are hereby permanently enjoined from directly or indirectly:

1. Engaging in conduct that violates Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C.§§ 6b(a)(2)(A)-(C);

2. Engaging in any activity involving:

(a) Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a (Supp. IV 2011));

(b) Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2012)) ("commodity options"), swaps (as that term is defined in Section 1a(47) of the Act, 7 U.S.C. § 1a(47) (Supp. IV 2011), and as further defined by Regulation 1.3, 17 C.F.R. §

17

1.3 (2012)), security futures products, and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i) (Supp. IV 2011)) ("forex contracts") for his own personal account or for any account in which he has a direct or indirect interest;

(c) Having any commodity futures, options on commodity futures, commodity options, swaps, security futures products, and/or forex contracts traded on his behalf;

(d) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, swaps, security futures products, and/or forex contracts;

(e) Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, swaps, security futures products, and/or forex contracts;

(f) Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and

(g) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a (Supp. IV 2011)) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012).

18

**IT IS FURTHER ORDERED** that Hudspeth is hereby directed to immediately  pay restitution in the amount of $429,781.65, jointly and severally, plus post-judgment interest (the "Restitution Obligation").  Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendant's pool participants, the Court appoints the National Futures Association ("NFA") as Monitor.  The Monitor shall collect restitution payments from the Defendant and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

Defendant shall make Restitution Obligation payments under this Order to the Monitor in the name "Hudspeth Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under a cover letter that identifies the Defendant and the name and docket number of this proceeding.  Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C.  20581.

The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendant's pool participants identified by the Commission or may defer distribution until such time as the

Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimus* nature such that the Monitor determines that the administrative cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth below.

Defendant shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendant's pool participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendant shall execute any documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendant's pool participants during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The amounts payable to each pool participant shall not limit the ability of any pool participant from proving that a greater amount is owed from Defendant or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.

Pursuant to Rule 71 of the Rules of Civil Procedure, each pool participant of Defendant who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may

seek to enforce obedience of this Order to obtain satisfaction of any portion of restitution that has

not been paid by the Defendant to ensure continued compliance with any provision of this Order

and to hold Defendant in contempt for any violations of any provision of this Order.

To the extent that any funds accrue to the U.S. Treasury for the satisfaction of

Defendant's Restitution Obligation, such funds shall be transferred to the Monitor for

disbursement in accordance with the procedures set forth above.

**IT IS FURTHER ORDERED** that Hudspeth is directed to pay a civil monetary penalty

("CMP") in the amount of $420,000 immediately and post-judgment interest shall accrue on the

CMP Obligations beginning on the date of entry of this Order and shall be determined by using

the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961.

Defendant shall pay his CMP Obligation by electronic funds transfer, or by U.S. Postal

money order, certified check, bank cashier's check, or bank money order. If payment is to be

made other than by electronic funds transfer, the payment shall be made payable to the

Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables – AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Defendant shall contact Linda

Zurhorst or her successor at the above address to receive payment instructions and shall fully

comply with these instructions. Defendant shall accompany payment of the penalty with a cover

letter that identifies the Defendant and the name and docket number of the proceedings. The

Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

Signed: April 3, 2013

Graham C. Mullen
United States District Judge